IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF TENNESSEE
EASTERN DIVISION

UNITED STATES OF AMERICA,

v.                                                       No. 1:08-cr-10119

DANIEL COWART and
PAUL SCHLESSELMAN,

     Defendants.

_____

ORDER DENYING DEFENDANTS' MOTIONS TO SUPPRESS EVIDENCE
_____

On November 20, 2008, a federal grand jury returned a ten-count superceding indictment

against Defendants, Daniel Cowart and Paul Schlesselman.  Both Defendants have filed motions to

suppress physical evidence and statements made to law enforcement personnel, alleging violations

of their Fourth, Fifth, and Fourteenth Amendment rights.  On April 16 and 17, 2009, the Court

conducted an evidentiary hearing regarding these motions, and the parties thereafter presented

supplemental memoranda.  After considering the positions of the Defendants and the Government,

this Court DENIES the motions to suppress.

RELEVANT PROCEDURE

Rule 12(b)(3)©, Federal Rules of Criminal Procedure, requires that motions to suppress

evidence be made before trial.  Where factual determinations are necessary, the Court should "state

its essential findings on the record."  Fed. R. Crim. P. 12(d).  In the Sixth Circuit, a trial court's

failure to state relevant findings of fact and conclusions of law on the record is reversible error.

1

United States v. Moore, 936 F.2d 287, 288-89 (6th Cir. 1991) (citing United States v. Prieto-Villa,

910 F.2d 601 (9th Cir. 1990)).


FINDINGS OF FACT[1]

Clark and Judy Cowart are the maternal grandparents of Daniel Cowart, and they participated

in his upbringing from the day he was born.[2]  (Hearing Transcript ("H.T.") pages 272-73, 313.)  His

grandfather described him as "more like a child to me than my grandson."  (Id.)  For about three or

four months prior to his arrest, Cowart lived with his grandparents at their two-story house in Bells,

Tennessee.  (H.T. at 274.)  Cowart, who was over eighteen, came and went as he pleased, but he did

not pay rent.  (H.T. at 105, 275-76, 299.)  He could access his living quarters through a stairway near

the backdoor without having to pass through the main body of the house.  (H.T. at 275-76.)  On the

second floor, Cowart maintained a private bedroom, bathroom, and a small den.  (H.T. at 274.)  That

floor also contained C. Cowart's office, a guest bedroom, and storage space.  (H.T. at 299-300.)  The

rooms occupied by Cowart had thumb-bolt locks on the doors, and his grandfather testified that

"[o]ccasionally Daniel would have his area locked, and if I needed in I'd knock on the door and he'd

let me in."  (H.T. at 300.)  His grandfather referred to Cowart's rooms as his "private domain" and

noted that he and his wife "did not interfere with him" and "let him have his privacy."  (H.T. at 274.)

---

[1]At the suppression hearing, the Court heard the sworn testimony of the following witnesses, who appeared in the order in which they are listed: Lieutenant Richard Stitts, Captain Eric Uselton, Sheriff Troy Klyce, Agent David Perry, Agent Jeff Barker, Agent Dan Clark, Clark Cowart, and Judy Cowart.

[2]In an effort to balance clarity and brevity, this Court will refer to Clark Cowart as "C. Cowart" and Judy Cowart as "J. Cowart."  Daniel Cowart will simply be called "Cowart."

On the evening of October 22, 2008, Lieutenant Richard Stitts of the Crockett County Sheriff's Department responded to a call from a Deputy Chism from Haywood County, Tennessee. (H.T. at 7.)  Deputy Chism said he had received information about criminal activity in Crockett County and suggested that the local authorities "take it and do what [they] wanted with it."  (H.T. at 8.)  He said that a female informant revealed to him that she had driven Cowart and someone named Paul, who was from Arkansas, during an attempted home invasion on the previous night. (H.T. at 8-11, 16, 39-40, 70.)  Providing the address of Cowart's grandparents, the informant said that Cowart and Paul had planned to rob and possibly murder the residents.  (Id.)  She claimed that the scheme had been aborted because she had backed out after becoming too scared.  (H.T. at 9.) Deputy Chism did not reveal the name of the informant or indicate that she had warned of impending criminal activity.  (H.T. at 9-11, 41.)

After this conversation, Lieutenant Stitts conferred with his captain, Eric Uselton, who was off-duty and working a second job at the time.[3]  (H.T. at 16.)  They decided he should go to the Cowarts' residence to check on their welfare and possibly inform them of the potential threat.  (H.T. at 17-18.)  Lieutenant Stitts drove his patrol car to the Cowarts' house, which is located about a quarter mile from the main road, and called their home telephone number.[4]  (H.T. at 18-19, 42, 278.)

---

[3]Officer Uselton testified that Lieutenant Stitts had received another telephone call while meeting with him.  (H.T. at 77.)  Uselton assumed that the call was from the Haywood County officer who had provided the information about the attempted home invasion, but he was not sure.  (Id.)  Lieutenant Stitts did not mention this second call in his testimony, and Uselton did not indicate what information had been exchanged during this call.

[4]The Defendants point out some temporal inconsistencies in the record.  C. and J. Cowart testified that Lieutenant Stitts mentioned that he had considered whether to inform them of the situation for three of four hours, but Stitts recalled that he had only pondered about this for ten or fifteen minutes.  (H.T. at 42 279, 319.)  Based on Stitts's testimony about when he received the call and when he arrived at the Cowarts' residence, a three to four hour delay would not have

3

Upon answering, C. Cowart complied with the officer's request to come outside to talk.  (H.T. at 19.)  C. Cowart sat in the passenger seat of the patrol car, and Lieutenant Stitts asked him a series of questions about his grandson.  (Id.)  C. Cowart expressed concern that his grandson had been involved with a "Skinhead" group over the Internet and that he had recently shaved his hair.[5]  (H.T. at 19, 280-81.)  Then Stitts told C. Cowart about the anonymous informant who claimed that his grandson, along with someone named Paul from Arkansas, had planned to murder him and his wife on the previous night.  (H.T. at 21.)  Stitts stated at the hearing that, after he relayed the information received from Deputy Chism, C. Cowart became "visibly shaken."  (H.T. at 44.)

C. Cowart initially did not want to believe that his grandson would consider harming his family, but the involvement of the unknown second person, in particular, gave him cause for alarm.  (H.T. at 280-81.)  Also, Stitts characterized the "Skinheads" as potentially dangerous and postulated that the planned home invasion might have been part of an initiation ritual.  (Id.)  Believing the officer to be sincere, C. Cowart was  "devastated" and "scared to death" for himself, his wife, and his grandson.  (H.T. at 281-82.)  C. Cowart said to Stitts, "I need you to come inside the house and tell my wife what's going on because . . . I'm so upset that I don't know if I can get it all across to her."  (H.T. at 282.)  Stitts had not requested to come inside the house prior to C. Cowart's

---

been possible.  (H.T. at 7, 278.)  However, the evidence does not suggest that this inconsistency springs from an intentional falsehood–particularly because the record does not reveal a clear motivation that would explain why the officer would lie about this factual detail.  Rather, Stitts may have meant to convey that it had felt like three or for hours.  Additionally, Lieutenant Stitts testified that he called the Cowarts' house at 9:30 P.M., but C. Cowart estimated that he received the call at 8:30.  (H.T. at 18-19, 42, 278.)  Obviously, one of the two is mistaken, but the question of exact timing is not particularly germane to the legal issues raised in this motion.

[5]C. Cowart and Lieutenant Stitts's testimonies differed regarding who first broached the subject of "Skinheads."  Stitts asserted that C. Cowart brought it up, but C. Cowart claimed it was the officer.  (H.T. at 58-60, 280.)

4

unsolicited invitation.

Once inside, the officer relayed basically the same information to J. Cowart as he had told her husband.  (H.T. at 282.)  Meanwhile, C. Cowart went upstairs to inspect his gun closet while the Lieutenant and his wife spoke in the kitchen.  (H.T. at 284-85.)  After determining that his gun closet was in order, C. Cowart walked through his grandson's room on his way back to the kitchen.  (H.T. at 285.)  C. Cowart later testified that, upon entering his grandson's room, "I almost got sick at my stomach, I was so scared.  And the thought that ran through my mind is, yes, they were really planning on doing harm to us."  (H.T. at 286.)  The cause of his shock was finding a sawed-off shotgun, a duffel bag containing a pistol, a roll of duct tape, and a package of nylon rope laying in the open in his grandson's living area.  (H.T. at 286.)  He called downstair to Stitts, "You need to come up here and take a look at what I just found."  (H.T. at 287.)

When Stitts heard the call from the second floor, he was unsure what had happened but he interpreted urgency in C. Cowart's tone so he ran upstairs.  (H.T. at 25.)  C. Cowart showed the officer what he had found and commented that the guns belonged to neither him nor his grandson. (H.T. at 25, 287.)  Stitts noticed an assault rifle, a couple of handguns, a sawed-off shotgun, a bow and arrows, knives, and swords.  (H.T. at 25.)  He examined the shotgun and unloaded it.  (H.T. at 287.)  After looking around the room briefly, Stitts suggested that they return downstairs, and he radioed for his dispatcher to contact the sheriff.  (H.T. at 25-26.)

In approximately fifteen minutes, Sheriff Troy Klyce and Deputy Phil Park arrived, and another officer came later.  (H.T. at 26-27.)  C. Cowart led the sheriff into the house to show him what he had found in his grandson's room.  (H.T. at 93-94.)  Sheriff Klyce surveyed the room and requested that C. Cowart not touch anything for the sake of preserving fingerprints.  (H.T. at 95.)

When Klyce saw the shotgun on the bed, he recognized that the barrel had been sawed off because it was barely as long as the magazine tube.  (H.T. at 97-98.)  He also noticed some books that he found unusual and a hand-drawn map.  (H.T. at 99-102.)

The Sheriff advised the Cowarts to leave the house as soon as possible.  (H.T. at 291, 321.) The Cowarts agreed and gathered some personal items for an overnight stay.  (Id.)  As they were preparing to leave, C. Cowart informed the officers that two handguns he kept in a downstairs closet were missing.  (H.T. at 118, 301.)  C. Cowart then gave Sheriff Klyce the keys to his house, for the purpose of removing his gun collection and locking up, and the code to the garage door because it was usually closed when his grandson returned.  (H.T. at 106, 291.)  Klyce stated that he planned to wait at the house, and C. Cowart informed him that his grandson routinely returned home around 10:00.  (H.T. at 106.)  According to Klyce, C. Cowart told him that there were drinks in the refrigerator and to "[j]ust make yourself at home and do what you got to do," and then he left for a motel.  (H.T. at 107, 289.)

The officers concealed their patrol cars, turned off several lights in the house, and closed the garage door to give Cowart the impression that nothing was amiss when he returned.  (H.T. at 27-28.)  Stitts drove about three-quarters of a mile down the road to wait at a local church so that he might alert the other officers to Cowart's arrival.  (H.T. at 28-29.)  Within twenty minutes, he spotted a silver Honda Civic covered with bright red swastikas and other writings.  (H.T. at 29, 36, 295.)  He radioed the Sheriff and then trailed the car from a distance.  (Id.)

The Honda's headlights went dark upon entering the driveway and the car stopped near the house.  (H.T. at 109)  Sheriff Klyce drove his Expedition to the driver's side of the Honda while activating his bright lights and blue lights, and officers surrounded the car with guns drawn.  (H.T.

at 110-11.)  In compliance with the officers' instructions, Cowart exited through the driver's side and laid on the ground with his hands behind his back; Schlesselman did the same from the passenger's side after struggling with his seatbelt.  (H.T. at 111-13.)  Schlesselman had a laptop computer in his lap at the time of the arrest.  (H.T. at 119.)  Sheriff Klyce noticed that Swastikas and the numbers fourteen and eighty-eight had been drawn on the car with red chalk, along with the phrases "Honk if you love Hitler" and "Sieg heil."  (H.T. at 115-16.)  After the suspects were restrained, Sheriff Klyce overheard Cowart utter "cease to co-exist with these people" without catching the full context of the statement.  (H.T. at 117-18.)  The Sheriff later recited Miranda rights to both Defendants.  (H.T. at 49, 117-18.)  Cowart acknowledged that he had a gun in the car, and the officers searched the Honda, finding a loaded handgun under the driver's seat and black gloves in the back seat.  (H.T. at 118-19.)  Prompted by a question from the sheriff, Schlesselman claimed ownership of the sawed-off shotgun that had been found in Cowart's room.  (H.T. at 120.)  Eventually, the officers transported the Defendants to the Crockett County jail.  (H.T. at 121.)  Then the officers conducted a more thorough search of the Cowarts' house, but they never obtained a search warrant because they thought C. Cowart had provided consent.  (H.T. at 122-23, 129-30.)

Around 9:00 the following morning, Sheriff Klyce called C. Cowart to say that subsequent information uncovered during the investigation suggested that he and his wife had not been the targets of the plot described by the informant.  (H.T. at 291-92.)  About an hour later, the Sheriff called back and confirmed that the Cowarts were in no immediate danger.  (Id.)  At some point in the line of communication among Officer Stitts, Deputy Chism, and the informant, there apparently had been a misstatement or misapprehension as to the target of the aborted home invasion on the evening of October 21.  (H.T. at 128.)  In actuality, the intended victim was Alton Kail, an older man

7

who lived near the Cowarts.  (Id.)  The Crockett County Sheriff's Department did not realize this error until after arresting the Defendants.  (H.T. at 127.)

Sheriff Klyce contacted the Bureau of Alcohol, Tobacco, Firearms and Explosives ("ATF") because the investigation also uncovered a plan to rob a federally licensed firearms dealer.  (H.T. at 121, 172.)  On October 23, 2009, two ATF agents, Brian Weaks and David James Perry, traveled to Crockett County, where they examined the available evidence and interviewed the informant that initially had tipped off Deputy Chism.  (H.T. at 173-74.)  Then the ATF agents met with Cowart around 4:50 in the afternoon.  (H.T. at 175-79, 181.)  Agent Perry provided Miranda rights to Cowart who signed a written waiver of these rights.  (Id.)  The agents told Cowart that he could have bathroom breaks or drinks at any time upon his request.  (H.T. at 180-81.)  During the interview, Cowart stated that he and Schlesselman had planned a multistate killing spree targeted at African-Americans that would conclude with the assassination of presidential candidate Barak Obama.  (H.T. at 188.)  His demeanor seemed to Agent Perry to be "very calm, very articulate, very polite and very cooperative" throughout their discussion.  (H.T. at 180-81.)  At the request of the agents, Cowart prepared a written statement summarizing what he had said.  (H.T. at 181-82.)  After he finished the initial draft, the agents reminded him about some details, which he previously had described, so he went back and included them in the written statement.  (H.T. at 182.)  He signed a document acknowledging that his statements were freely given, and then he made another verbal statement that was recorded.  (H.T. at 183.)  This entire process lasted until about 9:15 P.M.  (H.T. at 187.)

Schlesselman's interview began around 10:00 P.M.  (H.T. at 187.)  The agents were reluctant to wait until the next morning given the gravity of the plot Cowart had described and the potential danger to the public if other conspirators were involved whom the police had not yet identified.

(H.T. at 189-90.)  Schlesselman was eighteen years-old at this time, had an eighth grade education, and had no previous criminal convictions.  (H.T. at 205-08.)  The agents followed basically the same procedures during Schlesselman's interview as they had with Cowart.  They had him sign the standard <u>Miranda</u> form, explained his rights, gave him the opportunity to use the bathroom and obtain drinks, and allowed him to take a break to smoke a cigarette.  (H.T. at 191-93.)  Schlesselman was described as "alert, conscious[,] friendly and cooperative."  (H.T. at 192.)  Like Cowart, he also prepared a written statement, signed it, and then made a recorded verbal statement.  (H.T. at 194-99.)  This process took two to three hours.  (H.T. at 201-02, 207.)

Just as Schlesselman's interview began, Jeff Barker, a Special Agent with the United States Secret Service, arrived to investigate the potential assassination plot.  (H.T. at 187-88, 229-30.)  He attended the interview for the dual purpose of obtaining information for potential prosecution and assessing whether there were continuing threats to then-Senator Obama.  (H.T. at 230-31.)  At Agent Barker's request, Schlesselman signed a form consenting to both criminal and administrative searches of his residence at his parents' house in West Helena, Arkansas and his cellular phone.  (H.T. at 232.)  Schlesselman's demeanor struck Agent Barker as frank, lucid, and direct, and the agent did not suspect that the detainee had mental, physical, or literacy deficiencies.  (H.T. at 232-33.)  Subsequently, Agent Barker also obtained written consent from Cowart to search his residence, laptop, cell phone, CDs,  DVDs, and camera.  (H.T. at 234-35.)  Secret service agents traveled to West Helena to search a desktop and a laptop computer, for which they had also obtained a search warrant and consent from Schlesselman's parents.  (H.T. at 235-37, 268.)

CONCLUSIONS OF LAW AND FACT

I.      The Evidence Found in Cowart's Living Quarters

The Defendants aver that the evidence found in Cowart's living area within his grandparents' house was gathered in violation of the Fourth Amendment. The Government does not dispute that the police obtained this evidence without a warrant but asserts that C. Cowart consented to the search. Alternatively, the Government argues that, even if C. Cowart lacked actual authority over his grandson's living area, the police reasonably relied on his apparent authority in good faith. In response, the Defendants argue that Lieutenant Stitts's unintentional misrepresentations to C. Cowart rendered his consent invalid.

The Fourth Amendment ensures that "the right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures, shall not be violated." U.S. Const. amend. IV. The warrantless search of an area in which a defendant has a privacy interest[6] is *per se* unreasonable unless the Government can show that an exception applies. United States v.

---

[6]In order to have standing to suppress evidence obtained during in an illegal search or seizure, a defendant must establish that he had "a legitimate expectation of privacy in the invaded place." United States v. Gooch, 499 F.3d 596, 600 (6th Cir. 2007) (citing Rakas v. Illinois, 439 U.S. 128, 143, 99 S. Ct. 421, 58 L. Ed. 2d 387 (1978)). This "reasonable expectation of privacy" has both a subjective and objective component. First, a defendant's conduct must "exhibit[] an actual expectation of privacy" in the area searched. United States v. Waller, 426 F.3d 838, 844 (6th Cir. 2005) (citing United States v. King, 227 F.3d 732, 743 (6th Cir. 2000)). Second, the Defendant's "expectation of privacy [must be] one that society is prepared to recognize as reasonable." Id. (citing King, 227 F.3d at 743). In this case, Cowart claims that he had a reasonable expectation of privacy in his bedroom, bathroom, and den on the second floor of his grandparents' house. Schlesselman's apparently asserts that he also had a privacy interest as Cowart's overnight guest. See Minnesota v. Carter, 525 U.S. 83, 90, 119 S. Ct. 469, 142 L. Ed. 2d 373 (1998) (holding that "an overnight guest in a home may claim the protection of the Fourth Amendment, but one who is merely present with the consent of the householder may not"). The Government's brief does not dispute the Defendants' claims to privacy in the area searched.

Hudson, 405 F.3d 425, 441 (6th Cir. 2005) (quoting Katz v. United States, 389 U.S. 347, 357, 88

S. Ct. 507, 19 L. Ed. 2d 576 (1967)).  One well-established exception is voluntary consent from a

third-person with common authority over the searched premises.  Illinois v. Rodriguez, 497 U.S.

177, 179, 110 S. Ct. 2793, 111 L. Ed. 2d 148 (1990) (citing United States v. Matlock, 415 U.S. 164,

171 n.7, 39 L. Ed. 2d 242, 94 S. Ct. 988 (1974)); see also United States v. Clutter, 914 F.2d 775, 777

(6th Cir. 1990) (stating that "[a] search does not violate the Fourth Amendment where police obtain

consent to search from one who possesses common authority over the premises with the absent

non-consenting target of the search").  Consent may validate a search, regardless of whether it was

backed by a warrant or probable cause.  Schneckloth v. Bustamonte, 412 U.S. 218, 219, 93 S. Ct.

2041, 36 L. Ed. 2d 854 (1983).  The United States Supreme Court has held that "the consent of one

who possesses common authority over premises or effects is valid as against the absent,

nonconsenting person with whom that authority is shared."  Georgia v. Randolph, 547 U.S. 103,

110, 126 S. Ct. 1515, 164 L. Ed. 2d 208 (2006) (quoting Matlock, 415 U.S. at 170).  Common

authority arises from

> mutual use of the property by persons generally having joint access or control for
> most purposes, so that it is reasonable to recognize that any of the co-inhabitants has
> the right to permit the inspection in his own right and that the others have assumed
> the risk that one of their number might permit the common area to be searched.

Id. (quoting Matlock, 415 U.S. at 171 n.7).  Legal ownership of the area searched should be

considered to the extent that it influences "widely shared social expectations," but the question of

who has common authority should not be answered through a strict application of property law.  Id.

at 111 (citing Rakas v. Illinois, 439 U.S. 128, 144 n.12, 99 S. Ct. 421, 58 L. Ed. 2d 387 (1978)); see

also Chapman v. United States, 365 U.S. 610, 616-17, 81 S. Ct. 776, 5 L. Ed. 2d 828 (1961) (holding

that a landlord could not consent to a search of a tenant's home).  The Government bears the burden

of establishing that the third-person from whom consent was obtained had common authority. Rodriguez, 497 U.S. at 181.

The Defendants dispute C. Cowart's common authority to consent because his grandson maintained a private, apartment-like residence in the rooms searched. The Court will decide the issue of actual authority by considering the circumstances surrounding the Cowarts' living arrangements. Cowart had no property interest in the area in which he lived, whether a tenancy or freehold estate. While ownership is not dispositive as to common authority, someone who lives in a house pursuant to the goodwill of family members might expect a lesser degree of privacy–at least in relation to those owners–than a tenant who pays rent. C. Cowart referred to the area as his grandson's "private domain" and stated that he and his wife rarely disturbed him. Simply because Cowart's grandparents generally respected his privacy, however, does not necessarily give rise to a tacit understanding that they could not inspect certain rooms of their house without his permission. While Cowart "occasionally" locked the doors to his rooms, the entrance to his bedroom apparently was unlocked on the night of October 22, despite the fact that he had several weapons lying in the open. Additionally, after C. Cowart had checked the gun closet in his second floor office, he apparently had no reservations about walking through his grandson's room on the way back to the kitchen.[7] This suggests that C. Cowart did not normally have to ask for permission to enter his

---

[7]C. Cowart's testimony about finding the weapons went as follows:

A:    . . . . And then as I came back [from the upstairs office] is when I came back through Daniel's living quarters.

Q:    Okay, so you went from the kitchen on the first-floor level up the stairwell that comes in the front–up to the–from the front of the house to this top foyer we're talking about.

A:    Yes.

Q:    Office on one side, Daniel's living quarters on the other side. And then you went through two doors to get into his living space? Is that right?

12

grandson's living area and that he had "joint access or control [of this area] for most purposes."
Randolph, 547 U.S. at 110 (quoting Matlock, 415 U.S. at 171 n.7).  After considering all the relevant
circumstances, the Court finds that C. Cowart had common authority to consent to a search of his
grandson's living quarters.

In the alternative, the United States raises an apparent authority argument.  Even where a
party consenting to a search possessed no actual authority, evidence obtained still may be admissible
where "police conducted the search in good faith reliance on the third-party's apparent authority to
authorize the search through [his] consent."  United States v. Purcell, 526 F.3d 953, 963 (6th Cir.
2008) (quoting United States v. Morgan, 435 F.3d 660, 663 (6th Cir. 2006)).  The touchstone for
apparent authority is objective reasonableness from the perspective of the officer at the time of the
search.  In other words, "'would the facts available to the officer at the moment . . . warrant a man
of reasonable caution in the belief' that the consenting party had authority over the [area searched]?"
Id. (quoting Rodriguez, 497 U.S. at 188; Terry v. Ohio, 392 U.S. 1, 21-22, 88 S. Ct. 1868, 20 L. Ed.
2d 889 (1968) (alterations in original).  The Sixth Circuit has described three broad categories of
situations involving apparent authority: (1) where a reasonable officer would never be justified in
believing that the third-party had authority to consent (e.g. a mailman or a hotel clerk); (2) where

---

A:     No.  I just had to go through one door.

Q:     One door.  Okay.  And tell the court what happened next.

A:     When I started back downstairs I went through Daniel's area because the
       backstairs are there, and I knew that they [Lieutenant Stitts and J. Cowart]
       were down there at the bottom of the downstairs.  So I went through–I was
       going to go through there.  And when I went into Daniel's living quarters, I
       happened to notice there was a recliner sitting there on the right-hand side
       and there was a sawed-off shotgun laying there.

(H.T. at 285.)  In this testimony, C. Cowart seemed to indicate that it was not out of the ordinary for
him to cut through his grandson's room on his way downstairs to the kitchen.

a reasonable officer initially would not think that the third-party had authority to consent but "additional information [may indicate] common authority" (e.g. a landlord who does not live with the tenant but may provide other evidence revealing common use of the premises); (3) where a reasonable officer would assume that a person does have common authority over the space until information arises that indicates otherwise (e.g. someone who answers a knock at a residence or the carrier of a movable container). United States v. Jenkins, 92 F.3d 430, 437 (6th Cir. 1996).

The Court finds that this case falls into the third category. The rooms searched were within C. and J. Cowart's house. As well, C. Cowart invited Lieutenant Stitts inside and later called for him to come upstairs. Because a reasonable officer in Stitts's situation could assume that C. Cowart had free access to any room within his house, his consent was apparently valid unless and until facts came to light indicating limits to his authority. Id. Prior to the moment that Stitts heard the call for assistance from the second floor, nothing would have suggested that C. Cowart had ventured into an area of his house that was beyond the scope of his dominion, and, from this point forward, no new information surfaced that raised a red flag as to C. Cowart's lack of authority.[8] Although C. and J. Cowart asserted at the hearing that they afforded their grandson a certain degree of privacy, they did

---

[8]Schlesselman's brief argues that "Lt. Stitts and his fellow officers could have asked Clark and Jude Cowart [about] the nature of the area they were going to enter and whether it was Daniel's room or apartment." (Docket Entry ("D.E.") No. 89, Schlesselman's Brief, at 11.) Similarly, Cowart asserts that "[a]pparent authority was erased and was never reestablished" because Lieutenant Stitts did not conduct further investigation. (D.E. 90, Cowart's Brief, at 13.) Contrary to these contentions, however, the Sixth Circuit's opinion in Jenkins indicates a reasonable officer who encounters a situation inherently indicative of authority–i.e. the third category described–does not have an affirmative duty to ask questions about the extent of that authority. 92 F.3d at 437. While some circumstances may necessitate further inquiry–i.e. the second category in Jenkins–this was not the situation encountered by Lieutenant Stitts and the other officers. Id. Because neither Defendant has pointed to evidence in the record that would have undermined C. Cowart's apparent authority, their arguments are unavailing.

not testify that they shared this information with the police on the night of October 22. Any agreement that Cowart and his grandparents may have had regarding personal boundaries is irrelevant to an apparent authority inquiry unless such an agreement was made known explicitly or implicitly to the officers at the time of the search. Because nothing "put the officer[s] on notice of [the] apparent consenter's lack of authority," they reasonably relied on C. Cowart's consent. Jenkins, 92 F.3d at 437. As such, C. Cowart's permission provides an exception to the warrant requirement.

Finally, the Defendants argue that C. Cowart's consent should be found invalid. They cite to United States v. Hardin, 539 F.3d 404, 424-25 (6th Cir. 2008), in which the Sixth Circuit considered a case where an agent of the government gained access to an apartment by claiming that he needed to investigate a water leak. Id. at 407-08. The purported water leak was actually a subterfuge concocted by a police officer for the purpose of ascertaining a suspect's location. Id. The Sixth Circuit held that the consent to enter the apartment was invalid because it had been prompted by a ruse. Id. at 424-25. It noted that several cases have held that consent may be "tainted by 'duress, coercion [or] trickery.'" Id. at 425 (quoting United States v. Carter, 378 F.3d 584, 588 (6th Cir. 2004) (en banc); United States v. Jones, 641 F.2d 425, 429 (6th Cir. 1981)) (alterations in original). Although some delusory tactics are permissible,[9] an officer may not gain entry by employing a ruse that effectively "convince[s] the resident that he or she has no choice but to invite the . . . officer in." Id. at 424-25 (quoting United States v. Copeland, No. 95-5596, 1996 U.S. App.

_____

[9]For example, police officers may "use decoys and . . . conceal the identity of [their] agents" in drug transactions. Lewis v. United States, 385 U.S. 206, 208-09, 87 S. Ct. 424, 17 L. Ed. 2d 312 (1966). The Supreme Court has stated that "the particular circumstances of each case govern the admissibility of evidence obtained by stratagem or deception." Id. at 208.

LEXIS 17177, 1996 WL 306556, at *3 n.3 (6th Cir. June 6, 1996)); see also United States v. Giraldo, 743 F. Supp. 152, 154 (E.D.N.Y. 1990) (holding that a consent was invalid because a government agent faked a gas leak, which "falsely induc[ed] fear of an imminent life-threatening danger"); People v. Jefferson, 350 N.Y.S.2d 3, 4 (N.Y. App. Div. 1973) (same).

In this case, it is undisputed that Lieutenant Stitts's specific assertion that the Cowarts had been the targets of a murder plot later turned out to be incorrect. Further, there is little doubt that this warning prompted C. Cowart's request that the officer come inside. Unlike in Hardin, however, this case does not involve a police ruse–i.e. an deliberate effort to deceive in order to gain entry. 539 F.3d at 424-25. Although some details about the attempted home invasion turned out to be inaccurate upon further investigation, Stitts neither made intentional misrepresentations nor employed the informant's tip as a Trojan horse to infiltrate the walls of the Cowarts' house for ulterior purposes. Because there was no ruse to gain entry, the holding of Hardin does not apply in this case.

In an attempt to analogize, the Defendants argue that Stitts's inaccurate information was the result of a "shoddy investigation of the anonymous informant and her tip," and that his negligent misrepresentation left C. Cowart with no choice but to invite the officer inside. (D.E. 89, Schlesselman's Brief, at 10.) However, the Defendants have not cited and this Court has not found case law holding that good faith representations by officers, later found to be based on inaccurate information, may invalidate consent. Further, the Court does not find anything improper about the police response to the anonymous tip. After speaking with Deputy Chism, Lieutenant Stitts discussed the matter with Captain Uselton. Both officers determined that he should check on the Cowarts' welfare–a prudent reaction given the nature and severity of the threat. The Defendants

16

argue that Stitts should have conducted further investigation,[10] but merely visiting the Cowarts'

house required neither probable cause nor reasonable suspicion because Fourth Amendment

protections are not triggered until a search or seizure has occurred.  C. Cowart was not seized when

the officer requested that he come outside because he remained free to decline.[11]  See, e.g., Florida

v. Bostick, 501 U.S. 429, 439, 115 L. Ed. 2d 389, 111 S. Ct. 2382 (1991) (stating the seizure of a

person occurs only where "the police conduct would have communicated to a reasonable person that

the person was not free to decline the officers' requests or otherwise terminate the encounter")

(quoting Michigan v. Chesternut, 486 U.S. 567, 569, 108 S. Ct. 1975, 100 L. Ed. 2d 565 (1988));

United States v. Mendenhall, 446 U.S. 544, 554, 64 L. Ed. 2d 497, 100 S. Ct. 1870 (1980)

---

[10]In Schlesselman's brief, he argues that Lieutenant Stitts, before going to see the Cowarts, first should have pursued any one of the following options: called back Deputy Chism and asked to speak to the informant directly; called C. Cowart on the phone instead of going to his house; or asked the Cowarts to leave their house without searching it.  (D.E. 89, Schlesselman's Brief, at 10.)  While these may have been viable alternatives at the time, the Defendants have pointed to no law that would suggest any of these efforts were mandatory or that Lieutenant Stitts's chosen course of action was prohibited.

[11]The Government asserts that a "community caretaking" exception makes Lieutenant Stitts's conduct reasonable under the Fourth Amendment.  See United States v. Coccia, 446 F.3d 233, 238 (1st Cir. 2006).  The Supreme Court has described "community caretaking" as police actions that are "totally divorced from the detection, investigation, or acquisition of evidence relating to the violation of a criminal statute."  Cady v. Dombrowski, 413 U.S. 433, 441, 93 S. Ct. 2523, 37 L. Ed. 2d 706 (1973).  The Sixth Circuit has noted, however, that "we doubt that community caretaking will generally justify warrantless entries into private homes."  United States v. Williams, 354 F.3d 497, 508 (6th Cir. 2003).  Rather, this exception traditionally involves searches of automobiles.  Taylor v. Mich. Dep't of Natural Res., 502 F.3d 452, 463 (6th Cir. 2007) (citing United States v. Bute, 43 F.3d 531, 535 (10th Cir. 1994); United States v. Erickson, 991 F.2d 529, 531 (9th Cir. 1993)).  This Court has found no Sixth Circuit case law applying a community caretaking exception to validate the search of a residence, and there is no reason to address the issue in this case because the Court finds that the search was valid under settled law.  Cf. Clinton v. Jones, 520 U.S. 681, 690 n.11, 117 S. Ct. 1636, 137 L. Ed. 2d 945 (1997) (quoting Rescue Army v. Mun. Court of Los Angeles, 331 U.S. 549, 570 n.34, 91 L. Ed. 1666, 67 S. Ct. 1409 (1947)) ("It is not the habit of the court to decide questions of a constitutional nature unless absolutely necessary to a decision of the case.").

(articulating the "free to leave" test in a plurality opinion).  Once C. Cowart joined him in the patrol

car, Lieutenant Stitts merely explained the situation as he understood it at the time.  Undoubtedly,

C. Cowart was sincere when he said this information caused him to become "scared to death" and

"devastated," but his anxiety was not the result of improper police conduct.  Then Lieutenant Stitts,

though he never asked to search or come inside, acquiesced to C. Cowart's request to explain the

situation to his wife.[12]  In examining this chain of events, the Court observes no overbearing police

conduct that would somehow invalidate C. Cowart's consent.

Because C. Cowart voluntarily gave both actual and apparent consent, the Court finds that

the search was reasonable under the Fourth Amendment.

II.     The Evidence Obtained From Cowart's Car

The Defendants next contend that the search of Cowart's car violated their rights.  Fourth

Amendment jurisprudence recognizes several warrant exceptions specifically tailored for vehicles.

The Government initially argues that the exception for searches incident to arrest applies in this

situation.

In Chimel v. California, 395 U.S. 752, 763, 89 S. Ct. 2034, 23 L. Ed. 2d 685 (1969), the

Supreme Court recognized that an officer may perform a warrantless search incident to arrest, so

long as the search is limited to the area within the arrestee's "immediate control," which means "the

area from within which he might gain possession of a weapon or destructible evidence."  The

purpose of this exception is to allow officers the opportunity to "remove any weapons that [a

---

[12]While speaking to J. Cowart in the kitchen, Lieutenant Stitts heard C. Cowart urgently call from upstairs.  There is no indication from the record that, at that point, the officer knew C. Cowart had gone into his grandson's room.  Once upstairs, Lieutenant Stitts saw numerous weapons and other items in plain view, which would have corroborated the informant's tip about the attempted robbery and murder.

suspect] might seek to use in order to resist arrest or effect his escape" and to prevent the possible concealment or destruction of evidence.  Id. at 762-63.  In New York v. Belton, 453 U.S. 454, 101 S. Ct. 2860, 69 L. Ed. 2d 768 (1981), the Supreme Court applied the principles articulated in Chimel to occupants of automobiles.  That case concerned an officer's search of a jacket found in the passenger compartment of a vehicle while four recent occupants stood outside unsecured.  Id. at 456. The Supreme Court held that an officer who arrests "the occupant of an automobile . . . may, as a contemporaneous incident of that arrest, search the passenger compartment of the automobile" and any containers found inside.  Id. at 460.  Along with most other circuits, the Sixth Circuit interpreted Belton to permit a search of the entire passenger compartment of a vehicle in which an arrestee was found, regardless of whether the interior compartment was actually accessible to the arrestee at the time of the search.  See, e.g., United States v. Nichols, 512 F.3d 789, 796-97 (6th Cir. 2007); Northrop v. Trippett, 265 F.3d 372, 379 (6th Cir. 2001).  The Supreme Court recently held that such a broad interpretation of Belton was incorrect in Arizona v. Gant, __ U.S. __, 129 S. Ct. 1710, 1715, 173 L. Ed. 2d 485 (2009).  That decision involved a situation where officers arrested a driver for a suspended license, handcuffed him, and locked him in the back of a patrol car.  Subsequently, the officers searched the interior of the car that the arrestee had exited, uncovering a gun and a bag of cocaine.  Id.  In holding that this search violated the Fourth Amendment, the Supreme Court rejected the broad interpretation of Belton applied by many lower courts that "a vehicle search would be authorized incident to every arrest of a recent occupant . . . ."  Id. at 1719.  Instead, the warrant exception described in Chimel only applies to an officer "search[ing] a vehicle incident to a recent occupant's arrest . . . when the arrestee is unsecured and within reaching distance of the passenger compartment at the time of the search."  Id. (emphasis added).  The Supreme Court recognized that,

19

under this newly-announced rule, "it will be the rare case in which an officer is unable to fully effectuate an arrest so that a real possibility of access to the arrestee's vehicle remains." Id. at 1719 n.4. (citing 3 W. LaFave, Search and Seizure § 7.1(c), p. 525 (4th ed. 2004)).

In this case, the officers did not search the vehicle until after the Defendants had been arrested, handcuffed, searched upon their bodies, and restrained by at least four armed officers. Given these circumstances, a reasonable officer could not have considered either Cowart or Schlesselman capable of accessing the passenger compartment of the car at the time that the search was conducted.  Thus, even assuming the officers had probable cause to arrest the Defendants, the holding of Gant dictates that the search incident to arrest exception would not validate a warrantless search in this situation.

The Gant Court, though restraining the search incident to arrest exception, affirmed the viability of the probable cause exception for automobiles.  Id. at 1719.  In Carroll v. United States, 267 U.S. 132, 153, 69 L. Ed. 543, 45 S. Ct. 280 (1925), the Supreme Court first created a special exception to the warrant requirement for mobile vehicles as it recognized that "it is not practicable to secure a warrant because the vehicle can be quickly moved out of the locality or jurisdiction in which the warrant must be sought."  Since then, it has been well-established that, when an officer has probable cause to search a vehicle, "a search is not unreasonable if based on facts that would justify the issuance of a warrant, even though a warrant has not been actually obtained." Maryland v. Dyson, 527 U.S. 465, 467, 119 S. Ct. 2013, 144 L. Ed. 2d 442 (1999) (quoting United States v. Ross, 456 U.S. 798, 809, 72 L. Ed. 2d 572, 102 S. Ct. 2157 (1982)).  "Probable cause is defined as reasonable grounds for belief, supported by less than prima facie proof but more than mere suspicion, and is found to exist when there is a fair probability that evidence of a crime will be

located [in the area] of the proposed search."  United States v. Jackson, 470 F.3d 299, 306 (6th Cir. 2006) (quoting United States v. Jenkins, 396 F.3d 751, 760 (6th Cir. 2005; United States v. Bennett, 905 F.2d 931, 934 (6th Cir. 1990)) (internal citations and quotations omitted).  In Gant, the Supreme Court made clear that the circumstances giving rise to an arrest may also give officers probable cause to search a vehicle.  129 S. Ct. at 1719.  Gant only eliminated the automatic authority to search a vehicle upon the sole fact of an occupant's arrest.  Id.

   This Court finds that the officers had probable cause to search Cowart's vehicle.  Sheriff Klyce knew that C. Cowart was missing a handgun, and, when asked about the gun, Cowart told him that it was under the driver's seat.[13]  This gave the officers probable cause to believe that the car contained potentially incriminating evidence, considering that the Defendants' taking of the gun might constitute theft.  The laptop was in Schlesselman's lap at the time of his arrest, and the gloves were apparently in plain view in the back seat.  Further, the officers had probable cause to believe that both the gun and the black gloves had been procured to carry out the attempted home invasion described by the anonymous informant, whose story was corroborated by the paraphernalia found in Cowart's room.  Finally, the officers had reasonable grounds to believe that the laptop might contain information regarding the suspected robbery plot, particularly because of C. Cowart's

---

[13]Sheriff Klyce testified as follows:

A:   I knew I had a handgun that I couldn't find that belonged to Mr. Clark Cowart, and I asked Daniel about that handgun, did he have any weapons in the vehicle.

Q:   And what did he tell you?

A:   He told me there was one located under the driver's seat.

Q:   And did you, in fact, ultimately look under the driver's seat?

A:   We did.

Q:   And what did you find?

A:   We found a handgun, a loaded handgun, under the driver's seat. . . .

(H.T. at 118-19.)

concerns regarding his grandson's online activity, and Agent Barker subsequently obtained written consent from Cowart to search his laptop. Thus, because the officers had probable cause to believe that Cowart's car contained evidence of crimes, the well-recognized automobile exception to the warrant requirement alleviates any Fourth Amendment concerns.

III.   The Statements Made by the Defendants While in Custody and Evidence Obtained From Schlesselman's Home[14]

The Defendants argue that their statements made while in custody were involuntary.[15] Schlesselman also argues that he involuntarily signed the consent form, which allowed the Secret Service to search his residence and laptop computer.

The Due Process Clause of the Fifth Amendment guarantees that no person shall be deprived "of life, liberty, or property, without due process of law." U.S. Const. amend. V. Pursuant to due process, statements of a suspect may be deemed "involuntary" when obtained through official coercion. Seymour v. Walker, 224 F.3d 542, 554 (6th Cir. 2000). A voluntary statement is considered "the product of an essentially free and unconstrained choice . . . ." Schneckloth v. Bustamonte, 412 U.S. 218, 225, 93 S. Ct. 2041, 36 L. Ed. 2d 854 (1973). Before the Court may

---

[14]The Court will discuss these two issues together because both concern voluntariness of a statement.

[15]Schlesselman also asserts that his statements should be excluded as products of an illegal arrest. This Court, however, finds nothing improper about his arrest. As noted supra, the officers had probable cause to believe that the Defendants had committed theft and were in possession of a sawed-off shotgun. As the Sixth Circuit has noted, "a sawed-off shotgun in private hands is not an intrinsically innocent object. The possession of it is a serious crime, except under extraordinary circumstances . . . . The discovery of the sawed-off shotgun would have warranted officers of reasonable caution in the belief that an offense was being committed." United States v. Truitt, 521 F.2d 1174, 1177 (6th Cir. 1975) (quoting Porter v. United States, 335 F.2d 602, 607 (9th Cir. 1964)).

order suppression of an involuntary statement, however, police overreaching must also be shown to have occurred.  Colorado v. Connelly, 479 U.S. 157, 163, 107 S. Ct. 515, 93 L. Ed. 2d 473 (1986). In order to exclude statements on these grounds, the Defendants must establish the following three elements: "(I) the police activity was objectively coercive; (ii) the coercion in question was sufficient to overbear the defendant's will; and (iii) the alleged police misconduct was the crucial motivating factor in the defendant's decision to offer the statement."  United States v. Mahan, 190 F.3d 416, 422 (6th Cir. 1999) (citing McCall v. Dutton, 863 F.2d 454, 459 (6th Cir. 1988)).  The Court must rely upon circumstantial evidence to determine whether a defendant's will has been overborne.  See Culombe v. Connecticut, 367 U.S. 568, 605, 81 S. Ct. 1860, 6 L. Ed. 2d 1037 (1961) (observing that "the mental state of involuntariness upon which the due process question turns can never be affirmatively established other than circumstantially–that is, by inference").  Relevant factors in this totality-of-the-circumstances inquiry include–though are not limited to–the Defendant's age, education, intelligence, whether he was informed of his constitutional rights, his physical and emotional condition, the length and extent of the interrogation, the use of physical punishment such as food or sleep deprivation, his fear of violent reprisal, the proximity of the statement to a violent arrest, and the degree of coerciveness inherent in the setting.  Mahan, 190 F.3d at 422-23; United States v. Murphy, 763 F.2d 202, 205 (6th Cir. 1985).  The Government bears the burden of establishing voluntariness by a preponderance of the evidence.  Seymour, 224 F.3d at 554.

Upon considering the circumstances surrounding the Defendants' confessions as derived from the proof presented at the hearing, the Court infers neither official coercion nor suppression of free will.  The Defendants did not present evidence that the conditions of their detention were oppressive or in any way atypical.  Further, the Government has demonstrated, through documentary

23

and testimonial evidence, that the interrogating agents made reasonable efforts to inform both Defendants of their constitutional rights, ensure their understanding of these rights, and obtain voluntary waivers.  The Defendants heard their rights read orally, wrote initials beside written explanations of each right to signify their understanding, signed formal waivers, and signed documents signifying that their written statements were products of free will.  Also, the agents made efforts to accommodate the Defendants, offering them breaks and drinks upon request.  None of the witnesses who testified at the hearing thought that the Defendants had displayed signs of distress or fatigue.  To the contrary, Cowart was described as "very calm, very articulate, very polite and very cooperative," and Schlesselman was considered "alert, conscious[,] friendly and cooperative."  There was no evidence of coercive tactics, such as threats of violence, false promises, or sleep deprivation.  While Schlesselman's interview began relatively late in the evening, Agent Perry explained that a delay until the next morning would have be unwise because of the potential danger to the public, and the Court considers that to be a reasonable explanation.  In view of the totality of the circumstances, the Court holds that the Government has met its burden of showing that both confessions were voluntary.

Schlesselman's challenge to the search of his house similarly depends upon a voluntariness analysis, whereby the Court evaluates the totality of the circumstances surrounding his consent.  See, e.g., Ohio v. Robinette, 519 U.S. 33, 40, 117 S. Ct. 417, 136 L. Ed. 2d 347 (1996) ("The Fourth Amendment test for a valid consent to search is that the consent be voluntary, and 'voluntariness is a question of fact to be determined from all the circumstances.'") (quoting Florida v. Jimeno, 500 U.S. 248, 248-49, 111 S. Ct. 1801, 114 L. Ed. 2d 297 (1991)).  The factors that a Courts should consider to determine voluntariness of a consent to search are essentially the same as those involved

24

in determining the voluntariness of a confession.  <u>Schneckloth</u>, 412 U.S. at 226.  Schlesselman's argument that his consent was not voluntary relies entirely on his age, limited education, and mental health deficiencies.  However, Schlesselman's alleged impairments have not been shown to be so severe to render him incapable of reaching a "free and unconstrained choice" to permit a search.  <u>Id.</u> at 225.  Also, he did not present evidence of objectively coercive police conduct.  Finally, the Secret Service agents obtained both a warrant and consent from Schlesselman's parents.  Given these scrupulous efforts to abide by constitutional restraints, the Court cannot agree that the search was unreasonable.  <u>See</u> <u>Jimeno</u>, 500 U.S. at 250 (stating that the "touchstone of the Fourth Amendment is reasonableness").  Thus, the evidence obtained from Schlesselman's house is admissible.

      IV.   <u>Suppression as a Remedy</u>

The Government argues that suppression would be an inappropriate remedy under these circumstances.  Because the Court finds no constitutional violation, it need not address the issue of alternate remedies.

CONCLUSION

For the reasons articulated herein, the Court DENIES both Defendants' motions to suppress evidence on all grounds.

IT IS SO ORDERED this 5th day of June, 2009.

           s/  J. DANIEL BREEN
           UNITED STATES DISTRICT JUDGE